**Martial H. VOITIER et al.**

v.

**FIRST NATIONAL BANK OF COMMERCE.**

Civ. A. No. 80–3397.

United States District Court,
E. D. Louisiana.

May 22, 1981.

Robert Hugh Matthews, Robert M. Hearin, Jr., Matthews & Breeden, New Orleans, for plaintiffs.

Herschel L. Abbott, Jr., Marta Alison Richards, Edward H. Bergin, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant.

J. Michael Cutshaw, Alexandria, for Louisiana Bankers Association as *amicus curiae*.

David Willenzik, McGlinchey, Stafford & Mintz, New Orleans, for Hibernia National Bank, et al., as *amici curiae*.

## MEMORANDUM OPINION AND ORDER

BOYLE, District Judge:

This action arises under chapter 106, section 30 of the National Bank Act, 12 U.S.C. §§ 85–86, but resolution of the matter involves important questions of judicial first impression under the law of Louisiana. Plaintiffs, Martial Voitier and Terence Hall, allege that defendant, First National Bank of Commerce (FNBC), charged and received usurious interest for plaintiffs' two loans dated October 14, 1977 and September 8, 1978. Plaintiffs have moved for summary judgment with respect to both loans. Defendant has cross-moved for summary judgment with respect to loan # 1. For the following reasons, we find that neither loan was usurious. Therefore, plaintiffs' motion must be DENIED and summary judgment in favor of defendant must be GRANTED.

## I. THE FACTUAL BACKGROUND

On October 14, 1977, plaintiffs borrowed $525,000 from FNBC (Loan # 1) and agreed to repay this amount in stated principal installments over a two year period, subject to interest at a floating rate of 1.5% per year over FNBC's prime rate, adjusted monthly. The parties agreed in the note that the loan was made for non-consumer purposes, but further agreed that the loan would be "governed by and construed under" the Louisiana Consumer Credit Law (LCCL), LSA–R.S. 9:3510 *et seq.* The loan was secured by plaintiffs' pledge of a collateral mortgage note which was secured by a mortgage on certain real estate. On September 8, 1978, plaintiffs executed a renewal note (Loan # 2) in favor of FNBC in the face amount of $454,295.02, the then-remaining unpaid principal balance of Loan # 1. The principal sum was made payable over the thirteen months then remaining in the term of Loan # 1. Loan # 2 was made subject to interest under the same terms as Loan # 1 and was secured by the same collateral. Loan # 2 also contained the same clause as Loan # 1 making the loan subject to the LCCL.

Loan # 2 matured on November 1, 1979, but at that time the unpaid principal balance then due remained unpaid. Plaintiffs paid the remaining balance on June 23, 1980, and FNBC subsequently marked the note "PAID" and returned it to plaintiffs.

According to FNBC records and statements filed into the record of this case, the floating interest rate on Loan # 1 (FNBC's prime rate plus 1.5%, adjusted monthly) rose above 10% per year for several months during the period. The bank's records and statements also indicate that the floating interest rate on Loan # 2 remained above 10% for the entire period of this second loan, climbing to 18% per year for the final three months of the period. The records and statements indicate that plaintiffs were charged and paid the interest at these rates. FNBC contends, however, that the records do not accurately reflect the true situation.

The bank calculated the interest due on Loan # 1 using the actual/365 or 365/365 (hereinafter 365/365) method. This method calls for dividing the specified annual rate of interest by 365, multiplying the unpaid balance by that figure, and then further multiplying that result by the exact number of days in the month involved.

The bank's records and statements indicate that a different method was used to calculate interest on the second loan, the actual/360 or 365/360 (hereinafter 365/360) method. FNBC again contends that its records are inaccurate on this point. The 365/360 method calls for dividing the specified annual rate of interest by 360, multiplying the unpaid balance by that figure, and then further multiplying that result by the exact number of days in the month involved. Use of the 365/360 method yields 5/360 or 1/72 greater interest than the 365/365 method. In other words, applied to a loan with a nominal rate of 18%, the 365/360 method results in an effective annual rate of 18.25%. *See Gulf Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board*, No. 78–2549 (5th Cir. Dec. 15, 1980), slip op. at 5, n.1 (unpublished opinion).

Plaintiffs filed this suit in September, 1980. They allege that FNBC charged usurious interest on both Loan # 1 and Loan # 2. According to plaintiffs, the loans were subject to the 10% interest ceiling fixed by LSA–R.S. 9:3503.[1] Loans subject to the LCCL could yield interest up to 18%,[2] but plaintiffs contend that the agreement to bring these loans under the LCCL was ineffective. If this were true, plaintiffs would be entitled to recover double the $151,687.19 interest paid on the two loans, a total of $303,374.38. *See* 12 U.S.C. § 86.

In the alternative, if the agreement to contract the loans under the LCCL was valid, plaintiffs argue that Loan # 2 was nevertheless usurious. They contend that defendant used the 365/360 method to calculate interest at 18% during the final three months the loan was outstanding. Because this resulted in an effective rate of 18.25%, plaintiffs believe that this rate exceeded the LCCL's maximum permissible rate of 18% per year. If this were true, plaintiffs would be entitled to recover twice the $107,736.30 in interest paid on Loan # 2, a total of $215,526.60.

We disagree with both of plaintiffs' arguments. We find that neither loan was usurious.

## II. THE APPLICABLE LAW

### A. *Could Defendant Contract Plaintiffs' Loans Under the LCCL?*

Under the National Bank Act, defendant may charge interest on loans "at the rate allowed by the laws of the State ... where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located...." 12 U.S.C. § 85. Neither party has raised the possibility that plaintiffs' loans might be sustained under the second of these alternatives, so we assume this alternative is irrelevant to the present case. Therefore, the interest charged on plaintiffs' loans was usurious if it exceeded the maximum permissible under Louisiana law.

At the time of these loans, LSA–R.S. 9:3503 permitted a maximum interest rate

---

1. Plaintiffs first claim, without any explanation, that the 8% maximum rate under Louisiana Civil Code article 2924 is applicable. Section 9:3503 is applicable if the loans were "secured in whole or in part, directly or indirectly, by a [written] mortgage on immovable property." We need not decide this issue, because the interest rate undisputedly exceeded 10%, so the loan was usurious if either article 2924 or R.S. 9:3503 is applicable.

Effective July 6, 1979, after plaintiffs' loans were contracted, § 9:3503 was amended to permit a maximum yield of 12% per annum. Acts 1979, No. 205, § 1.

2. LSA–R.S. § 9:3519 A(e) (West.Pamph. 1951 to 1979). Subsection (e) was deleted by a 1980 amendment to the LCCL. Acts 1980, No. 501, § 1, effective July 22, 1980. The LCCL now permits a maximum interest rate of 21% per year on unpaid principal in excess of $7,000. LSA–R.S. § 9:3519 A(d) (West.Pamph. 1951 to 1980).

of 10% on loans secured by a written mortgage on immovable property. However, loans subject to the LCCL, under LSA–R.S. 9:3519, could yield up to 18% interest.

Prior to its amendment in 1980, the LCCL provided in pertinent part:

> This chapter does not displace legal limitations upon the powers of credit unions, savings banks, savings and loan associations or other thrift institutions whether organized for the profit of shareholders or as mutual organizations, but *the parties to a transaction other than a consumer credit transaction*, whether any of such parties is such a thrift institution or not, *may contract with one another that such transaction shall be subject to the provisions of this chapter, in which event the transaction shall be a consumer credit transaction within the provisions of this chapter.*

LSA–R.S. 9:3514 (West.Pamph. 1951 to 1979) (emphasis added).

Before its amendment in 1980, the LCCL provided a definition of "consumer loan" which excluded loans exceeding $25,000. LSA–R.S. 9:3516(13) (West.Pamph. 1951 to 1979). Both loans under consideration exceeded $25,000.

Section 9:3514 clearly allows parties to a non-consumer credit transaction to agree that their transaction "shall be a consumer credit transaction within the provisions of [the LCCL]." Plaintiffs contend, however, that this language should be interpreted as permitting only parties to a nonconsumer transaction of less than $25,000 to opt into the LCCL. They claim it is "ludicrous" to believe the Louisiana legislature intended to permit loans as large as. plaintiffs' to be contracted under the LCCL.

The language of 9:3514 is clear and unambiguous. Under these circumstances, it would be inappropriate for the court to attempt to discern legislative intent. Article 13 of the Louisiana Civil Code mandates: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." *See Gill Trailer & Equipment Rentals, Inc. v. S. D'Antoni, Inc.*, 282 So.2d 714, 716 (La.1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974). If the legislature erred in expressing its intention, it is not the function of the judiciary to correct the error, unless the error creates ambiguity. *Rada v. Administrator, Division of Employment Security*, 319 S.2d 460, 463 (La.App. 4th Cir.), *writ refused*, 323 So.2d 128 (La.1975).

Plaintiffs' argument is rather curious in view of the fact that the legislature in 1980 specifically deleted the $25,000 limitation from the definition of "consumer loan." *See* LSA–R.S. 9:3516(13) (West.Pamph. 1951 to 1980). What is claimed was "ludicrous" in 1972 is now expressly authorized.

Our conclusion that the parties could agree to subject their loans to the LCCL accords with Opinion No. 74–1160 of the Attorney General of the State of Louisiana, dated August 16, 1974. The opinion, authored by First Assistant Attorney General Warren E. Mouledoux, stated that the language of 9:3514 was "clear and explicit."[3] The opinion concluded: "a bank and a borrower may legally agree that a loan shall be subject to the Consumer Credit Law, even though it exceeds $25,000.00, and that, accordingly, the bank may then charge interest pursuant to the other provisions of the Consumer Credit Law." While not

---

3. In our view, the opinion could have concluded at this point. However, the Attorney General saw fit to attempt to bolster his opinion with a misquotation of a comment to the Uniform Consumer Credit Code (U3C), which, according to the opinion, "the Legislature apparently relied upon in drafting the [LCCL]."

Plaintiffs expend much effort attacking the opinion due to the misquotation, but we think the error is of no significance. The Attorney General's reliance on the U3C may or may not

have been misplaced, but we hardly think it necessary to construe an unambiguous statute by reference to comments to an entirely different law, a law not adopted in Louisiana. The U3C "apparently was the source for the general framework and several particular provisions of the LCCL; however, there are significant differences between the two codes." Comment, *Usury and Consumer Credit Law in Louisiana*, 53 Tul.L.Rev. 1439, 1455 (1979) (footnote omitted).

binding on the judiciary, an opinion of the Attorney General is regarded as persuasive authority by Louisiana courts. *See, e. g., McElveen v. Callahan*, 309 So.2d 379, 380–81 (La.App. 3rd Cir.), *writ denied*, 313 So.2d 602 (La.1975); *Danna v. Commissioner of Insurance*, 228 So.2d 708, 711 (La.App. 1st Cir. 1969).

The Attorney General issued his opinion in response to a request by the Commissioner of Financial Institutions. The Commissioner is obliged to examine all persons regulated under the LCCL and to enforce the provisions of the LCCL. Pursuant to the opinion, the Commissioner has consistently interpreted 9:3514 as permitting parties to subject loan transactions involving amounts greater than $25,000 to the provisions of the LCCL. *See* affidavits of Frank Lassiter and Hunter O. Wagner, Jr., attached to Record Doc. No. 21. Under the long-established Louisiana legal doctrine of contemporaneous construction, "when an administrative body has over a long period of time placed an interpretation upon a legislative enactment, the interpretation of said body is entitled to great weight in the determination of the meaning of the legislative enactment." *Ouachita Parish School Board v. Ouachita Parish Supervisors Ass'n*, 362 So.2d 1138, 1142 (La.App.2d Cir. 1978).

Plaintiffs contend that the 1980 amendments deleting the $25,000 limitation from the LCCL prove that loans greater than this amount could not be made subject to the LCCL prior to the amendments. Had the legislature accepted the views of the Attorney General and the Commissioner, argue plaintiffs, it would not have engaged in the "vain and useless" endeavor of enacting the amendments. Record Doc. No. 24, at 4. If the legislature had truly disagreed with the views of the Attorney General and the Commissioner, it would have amended the law to prohibit that which was being permitted. Instead, the legislature modified the law to, accord expressly with the interpretations of the two executive officers. This was by no means a meaningless gesture. These executive opinions were not binding upon the judiciary; the legislature presumably wished to protect lenders from judges who might interpret the law differently. Plaintiffs have not produced any legislative history which suggests that the amendments were intended to change, rather than clarify, the LCCL on this point.

Accordingly, we find that the parties could and did agree to subject their loan agreements to the LCCL. Because the interest rate on Loan # 1 remained below the then-applicable LCCL maximum of 18% throughout the term of the loan, defendant's motion for summary judgment with respect to Loan # 1 must be granted.

## B. Was Loan # 2 Usurious Under the Provisions of the LCCL?

Plaintiff's second argument is that Loan # 2 is usurious, even under the LCCL, because the effective interest rate exceeded the 18% maximum rate for the final three months that the loan was outstanding. Plaintiffs contend that they were charged 18% interest calculated under the 365/360 method, which resulted in an allegedly usurious effective rate of 18.25%.

Defendant contends that there is an issue of fact as to whether the bank used the 365/360 method when interest on the loan rose to 18%. Notwithstanding the fact that its internal manual record of the booking of Loan # 2, its internal computer records, and its debit and billing advices show that the bank used the 365/360 method throughout the life of Loan # 2,[4] defendant suggests that it only used this method when the loan's interest rate was below 18%.

---

4. *See, e. g.,* "Secured Note Data and Payment Record," Record Doc. No. 22, Exhibit 2, at 20 ("Accrual Basis" of loan indicated to be "Act/360"); *id.* at 25 (indicating a charge of $3,975.43 in interest for the period from April 8, 1980 to May 2, 1980, which approximately amounts to 18% interest on the basis of the 365/360 method on the then outstanding principal amount of $335,315.02 (18% ÷ 360 × 24 (number of days in the period) × $335,315.02 = $4,023.78, which is approximately equal to $4,023.79, the total of the charged sum of $3,975.43 plus a credit of $48.36 for an overpayment from the previous period).

Defendant has never clearly stated the basis for its contention that the 365/360 method was not used when the interest rate rose to 18%. In its Statement of Material Facts as to Which There Is a Genuine Issue to be Tried, defendant asserted that its records "were not always a true reflection of the amounts of interest due under the terms of the notes." Defendant did not offer any evidence to contradict the records; it merely stated that the matter was "greatly complicated" and that "a significant amount of testimony [at trial] will be necessary" to explain the true situation. Record Doc. No. 26, attachment, at 1–2.

In its reply memorandum of March 23, 1981, defendant retreated from its earlier position that trial testimony would be necessary to resolve the alleged factual dispute. The bank stated its intention to bring its own motion for summary judgment on this issue "[a]s soon as the factual issues are fully developed and the issues resolved." Record Doc. No. 31, at 6.

■ Defendant seems to be under the erroneous impression that it may defeat plaintiffs' motion for summary judgment simply by declaring that certain facts are in dispute. The bank's announcement that it will file its version of the facts and its motion for summary judgment at its leisure is unavailing. Plaintiffs have submitted bank records which appear to indicate clearly that the 365/360 method was used to calculate the interest on Loan # 2 when the interest rate was 18%. If it wished to contend that the records are inaccurate, defendant should have produced opposing documentary or testimonial evidence to show there is a genuine issue of fact. As the Fifth Circuit Court of Appeals has noted,

It is elementary that where the party moving for summary judgment supports his motion with sworn matter or admissions, the opponent bears a burden of presenting affidavits or other proper matter sufficient to create a genuine dispute of fact. Pleadings will not suffice to defer the evil day, and the opposing party, facing such a situation, may not choose to wait until trial to develop

claims or defenses relevant to the summary judgment motion.

*Golden Oil Co., Inc. v. Exxon Co.*, 543 F.2d 548, 551 (5th Cir. 1976). *See also Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978).

We have carefully examined all information filed into the record to determine whether there is a genuine issue of fact with respect to whether the bank used the 365/360 method to compute interest during the period when the rate was 18%. In their motion for summary judgment of February 23, 1981, Record Doc. No. 22, at 15–18, their rebuttal memorandum of March 13, 1981, Record Doc. No. 28, at 3, and their letter memorandum of March 26, 1981, Record Doc. No. 33, plaintiffs submitted that "defendant's alleged disputed material facts ... derive from its attempt to recalculate and restructure the entire interest on loan number 2 in an effort to bring the interest charged within the maximum permissible rates under the [LCCL]." Record Doc. No. 28, at 3. In none of its filings has defendant denied that this is the true nature of its alleged factual dispute.

At the deposition of Marcia Beer, defendant's loan compliance officer, defendant presented a restructured loan chart for Loan # 2. Record Doc. No. 34, attachment designated "Beer No. 4." Alleging that the bank was entitled to assess more interest than it did during certain periods when the rate was below 18%, Ms. Beer testified that she recalculated or restructured the interest for the entire loan using the 365/360 method when the rate was below 18% but shifting to the 365/365 method when the rate reached 18%. Record Doc. No. 35, at 102–05. Based on this restructuring, the bank apparently claims that although plaintiffs were billed at 18% under the 365/360 method, in reality they were being charged at 18% under the 365/365 method, with the excess attributable to the earlier periods in which plaintiffs were allegedly undercharged.

Ms. Beer admitted that it was not a common practice for the bank to restructure loan interest and that she did not do so in

this instance until after the plaintiffs had paid the loan and commenced this litigation:

Q   In connection with loans of this nature, is it a common practice for the bank once a loan has been paid out and the note has been returned, to go back and restructure or recalculate the interest for the entire loan as you have done in this case?

A   No.

   *       *       *       *       *       *

Q   Do you know of any other instances of any personal knowledge in which the bank has gone back and done what you have done in this case?

A   I can't answer that.  I don't know.

Q   Of your own personal knowledge, do you know of any other instances?

A   No.

Q   Why did you do it in this particular case?

A   *I did these recalculations on this loan in order to be able to answer your questions.*

Record Doc. No. 35, at 121–22 (emphasis added).

It thus appears that the defendant's "factual" issue concerns whether the bank could properly recalculate or restructure the loan interest after the note had been marked "PAID" and returned to plaintiffs, and after litigation had been commenced.  This is a question of law, not fact.  Indeed the testimony of Ms. Beer demonstrates that the recalculation was done for purposes of this litigation and not to comply with the law.  Accordingly, because there do not appear to be any genuine issues of material fact, we find that the matter is ripe for summary judgment.[5]

In *Paulat v. Pirello*, 353 So.2d 1307 (La. 1977), the Louisiana Supreme Court was faced with the question "whether a lender may avoid forfeiture of payments made and received as usurious interest, by re-characterizing them as payments on principal, after the borrower disputes their usurious character."  *Id.* at 1308.  The court, in an opinion by Justice Tate, now Judge Tate of the United States Court of Appeals for the Fifth Circuit, held that the lender could not re-characterize the payments.  The court reasoned that because the borrower made payments denoted as interest and the lender accepted them as such, the payments were made and received by virtue of an express or implied contract which the lender could not subsequently disavow.  *Id.* at 1310.

■   Under the rationale of *Paulat*, we conclude that defendant FNBC could not re-characterize or restructure plaintiffs' interest payments after this litigation had begun.  The bank expressly or impliedly contracted for and received interest payments from plaintiffs at the rate of 18% interest calculated under the 365/360 method.  We must now consider whether defendant could legally charge this amount of interest under the LCCL.

The 365/360 method of interest calculation has been widely used in the banking industry for the past two centuries.  A 1971 Federal Reserve Board study indicated that 82 percent of all commercial banks used this method on at least some loans.  Congressman Wright Patman has estimated that of the total amount of interest collected annually in the United States, $145 million is due to the difference between stated and actual rates that results from use of the 365/360 method.  *See* Comment, *Legal Aspects of the Use of "Ordinary Simple Interest"*, 40 U.Chi.L.Rev. 141, 142–43 (1972).

Borrowers charged interest computed by means of the 365/360 method at the maximum rate allowed by law have frequently brought usury actions against their lenders.  In the first such reported case, *New York Firemen Insurance Co. v. Ely & Parsons*, 2 Cow. 678 (N.Y.1824), the court found the challenged loan usurious.  Throughout the remainder of the nineteenth century and

---

5.   Of course, in view of our disposition of the issues, if there is any true factual dispute on this point it is immaterial.

the first half of the twentieth century, however, the vast majority of courts rejected the *Ely & Parsons* view. *See generally* Comment, *supra* at 145–52; Annot., 35 A.L.R.2d 842, 843–50 (1954).

The courts that rejected the *Ely & Parsons* rationale usually found that established banking custom and the need for easy calculation justified the use of the 365/360 method. It was said that computation of interest under the 365/365 method was far more difficult than under the 365/360 method. In addition, some courts found that there was no legislative intent to interfere with this long-established custom. Other courts dismissed the problem as insignificant, because each borrower suffers only slight harm. *See* cases cited in Comment, *supra*, at 145–50; Annot., *supra*, at 843–48.

In recent years, with the advent of computerized banking, the rationale of these earlier cases has been carefully reconsidered. As one commentator noted,

> [i]nterest is now calculated, not by uneducated bank clerks, but by computers that can easily be programmed to use any method of calculation. The advanced technology would seem to support an inference that the lender using the 365/360 method does so in order to collect the excess interest rather than to promote convenience.

Comment, *supra*, at 148.

The United States Court of Appeals for the Ninth Circuit, applying Oregon law, agreed with this rationale in *American Timber & Trading Co. v. First National Bank of Oregon*, 511 F.2d 980, 983–84 (9th Cir. 1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975). The Ninth Circuit agreed with District Judge Goodwin's conclusion that the usury statute "should be construed with regard to its net effect upon the borrower rather than upon the bookkeeping burden, custom, or convenience of the lender." *Id.* at 983. The Ninth Circuit was especially skeptical of the defendant bank's convenience argument in view of the fact that the bank used the 365/365 method

to compute interest it paid to its depositors. *Id.* at 983–84.

*American Timber* has been received enthusiastically by publicists. *See, e. g.*, Comment, *supra*, at 148–49; Note, 6 U.Tol.L. Rev. 541, 559 (1975). More importantly, the decision has been expressly followed by most courts which have recently considered the issue. *See O'Brien v. Shearson Hayden Stone, Inc.*, 90 Wash.2d 680, 586 P.2d 830, 836 (1978); *Ellis National Bank of Tallahassee v. Davis*, 359 So.2d 466, 468–69 (Fla. App.), *cert. denied*, 365 So.2d 711 (Fla.1978). Also, the California Supreme Court relied on *American Timber* in reaching its conclusion that use of the 365/360 method constitutes false and misleading advertising. *Chern v. Bank of America*, 15 Cal.3d 866, 127 Cal.Rptr. 110, 544 P.2d 1310 (1976) (en banc).

Not all courts have followed *American Timber*, however. In *Beazley v. Georgia Railroad Bank & Trust Co.*, 144 Ga.App. 215, 241 S.E.2d 39, 40 (1977), a Georgia intermediate court followed a 1906 decision of the Georgia Supreme Court and found that a loan which yielded interest at the maximum legal rate was not usurious, even though the 365/360 method was used. And the Arkansas Supreme Court, with one justice dissenting, concluded with "no hesitancy" that "for practical, legal, and historical reasons, ... the use of the 360–day year is lawful even when the interest is [the legal maximum]." *Martin v. Moore*, 601 S.W.2d 838, 839 (Ark.1980). *But see Cagle v. Boyle Mortgage Company*, 261 Ark. 437, 549 S.W.2d 474 (1977) (seemingly contra).

As a matter of principle, we agree with the rationale of *American Timber* and its progeny. Neither *Beazley* nor *Martin* even attempted to rebut the persuasive rationale of the Ninth Circuit. The "difficulty of calculation" argument loses whatever force it may have ever had in the face of Ms. Beer's frank admission that it is just as easy to calculate interest using the 365/365 or the 360/360 [6] method as the 365/360 method:

> for dividing the specified annual interest rate by 12 and then multiplying the unpaid balance

---

**6.** The 360/360 method, which yields the same amount of interest as the 365/365 method, calls

Q Is it more difficult for a bank to calculate interest according to the 365/365 method than it is the 365/360 method on a particular loan?

A Is it more difficult?

Q Right.

A No.

Q Is it more difficult calculating interest on the 360/360 than the 365/360 method?

A No.

Q So as far as ease of interest calculations and that is concerned, there is no reason for the bank to select one method as opposed to another method?

A No reason to.

Q As far as ease of calculation?

A No.

Record Doc. No. 34, at 30–31. Furthermore, we agree that "[a] year has 365 days, except for a leap year, and no amount of juggling the figures or resorting to rhetoric can change the facts." *Martin v. Moore*, supra, 601 S.W.2d at 841 (Purtle, J., dissenting). However, we may not decide this case based on our personal views. We must predict how the Louisiana Supreme Court would decide the issue and render our decision accordingly. *See Stephens v. State Farm Mutual Automobile Insurance Co.*, 508 F.2d 1363, 1366 (5th Cir. 1975); *Stool v. J. C. Penney Co., Inc.*, 404 F.2d 562, 563 (5th Cir. 1968).

The question whether interest at the maximum legal rate is usurious when calculated under the 365/360 method is one of first impression under Louisiana law. Contrary to defendant's assertion, the Louisiana Supreme Court's decision in *Planters' Bank v. Bass*, 2 La.Ann. 430 (1847), is inapposite. That case involved application of Mississippi law. The court simply cited a Mississippi Supreme Court decision as controlling and did not make any independent analysis of the issue. *See id.* at 437.

We believe that the Louisiana Supreme Court, if squarely presented with this issue, would hold that use of the 365/360 method is permissible, even when interest is charged at the maximum permissible rate under the LCCL. Although it would undoubtedly give due regard to decisions from other jurisdictions such as *American Timber*, in accordance with Louisiana's civilian tradition, the Supreme Court would give greater weight to the probable intent of the Louisiana legislature.

The applicable statute, LSA–R.S. 9:3519 A(e), permitted a maximum finance charge of "eighteen percent per year." If this provision stood alone, we would likely reach the same conclusion as the *American Timber* court. Article 14 of the Louisiana Civil Code declares: "The words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words." The general, popular, most usual meaning of the word "year" is 365 days, not 360 days.

Of course, however, section 9:3519 A(e) does not stand alone. It is but one provision of the comprehensive LCCL. Therefore, article 17 of the Civil Code is significant: "Laws *in pari materia*, or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another."

Both plaintiffs and defendant contend that section 9:3519 C supports their interpretation of section 9:3519 A(e). Section 9:3519 C provides in pertinent part: "For the purposes of this section, the term of a loan commences with the date the loan is made. *Differences in the lengths of months are disregarded* and *a day may be counted as one-thirtieth of a month.*" (Emphasis added.) The first italicized phrase appears to support plaintiffs, because differences in the lengths of months are *not* disregarded when interest is calculated by means of the 365/360 method. Nor are differences in lengths disregarded

by the percentage so obtained, regardless of the exact number of days in the particular month.

Record Doc. No. 34, Exhibit Beer No. 1.

under the 365/365 method, however. The second italicized phrase supports defendant's position. If a day may be counted as one-thirtieth of a month, it would seem to follow that it may also be counted as one-360th of a year. Reading section 9:3519 C in its entirety, we are unable to make a conclusive determination of legislative intent from this most unclear provision.

In our opinion, the dispositive provision is section 9:3519 D(2). This section, which is directly applicable only to loans made pursuant to revolving loan accounts with non-monthly billing cycles, states that

> the loan finance charge shall be deemed not to exceed the maximum annual rates if the loan finance charge contracted for and received does not exceed a percentage which bears the same relation to the maximum annual rates as the number of days in the billing cycle bears to 360.

This provision can only be characterized as expressly authorizing use of the 365/360 method, even when the interest rate is at the statutory maximum. When interest is at the statutory maximum and the 365/360 method is used to calculate the interest, the actual loan finance charge *equals*, but does not exceed, the percentage which bears the same relation to the maximum annual rates as the number of days in the billing cycle bears to 360. For example, if the billing cycle is annual, the actual loan finance charge for the year equals 18.25%. (18%/360 × 365 = 18.25%.) This bears the same relation to the statutory maximum annual rate (18.25%/18% = 1.01388) as the number of days in the billing cycle bears to 360 (365/360 = 1.01388). If there are thirty-one days in the billing cycle, then the loan finance charge for the period amounts to 1.55% (18%/360 × 31 = 1.55%). Once again, this rate bears the same relation to the maximum annual rate (1.55%/18% = .086111) as the number of days in the billing cycle bears to 360 (31/360 = .086111). The same result is obtained regardless of the number of days in the

billing cycle. Therefore, it is beyond argument that the 365/360 method is permissible if the loan is governed by § 9:3519 D(2).

Of course, plaintiffs' loans were not governed by § 9:3519 D(2), because the loans were not made pursuant to a revolving loan account and the billing cycle was monthly. However, in accordance with article 17 of the Civil Code, the clear language of § 9:3519 D(2) "may be called in aid to explain what is doubtful" in § 9:3519 A(e). We cannot believe that the legislature intended § 9:3519 A(e) to prohibit that which was expressly authorized in § 9:3519 D(2). We can conceive of no reason why the legislature would have wanted to permit use of the 365/360 method with respect to revolving loans with non-monthly billing cycles but not other loans. Accordingly, although the Louisiana Supreme Court would recognize the validity of the policy arguments underlying the *American Timber* case and its progeny, the court would most likely hold that the legislature intended the contrary result. We therefore find that Loan # 2 was not usurious.

## III. CONCLUSION AND ORDER

Because neither of the plaintiffs' loans was usurious, plaintiffs' motion for summary judgment must be, and hereby is, DENIED. Defendant's motion for summary judgment with respect to Loan # 1 is GRANTED.[7]

Defendant has not moved for summary judgment with respect to Loan # 2. However, in view of our disposition of the issues, it is entitled to such. *See E. C. Ernst, Inc. v. General Motors Corp.*, 537 F.2d 105, 109 (5th Cir. 1976); *Lowenschuss v. Kane*, 520 F.2d 255, 261 (2d Cir. 1975); C. Wright & A. Miller, Federal Practice and Procedure (Civil) § 2719, 2720 (1973). Therefore, on our own motion, summary judgment in favor of defendant with respect to Loan # 2 is GRANTED.

7. We received and considered the amici briefs of the Louisiana Bankers Association, various national and state banks, mortgage lenders and a national trade association supporting the defendant's Motion for Partial Summary Judgment and defendant's opposition to plaintiffs' Motion for Summary Judgment.